IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELISHA L. GRESHAM,                          )
                                            )
                    Plaintiff,              )
                                            )
        v.                                  )   C.A. No. 16-1315 (MN)
                                            )
STATE OF DELAWARE DEPARTMENT                )
OF HEALTH AND SOCIAL SERVICES,              )
                                            )
                    Defendant.              )

## **MEMORANDUM OPINION**

Elisha L. Gresham, New Castle, Delaware.   Pro Se Plaintiff.

Allison Jean McCowan, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware.   Counsel for Defendant.

January 15, 2020
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

Plaintiff Elisha L. Gresham ("Plaintiff"), who proceeds *pro se* and has been granted leave to proceed *in forma pauperis*, filed this employment discrimination action on December 27, 2016, against the Delaware Department of Health and Human Social Services ("Defendant" or "DHSS"). (D.I. 2). Plaintiff's Amended Complaint, filed following dismissal of the original Complaint, asserted disability discrimination in violation of Titles I and V of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, and the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. §§ 701, *et seq.* and race and gender discrimination under Title VII ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.* (D.I. 23). The case proceeds on the Title VII hostile work environment and retaliation claims, the Court having dismissed the ADA and Rehab Act claims. (D.I. 30; D.I. 31). Before the Court is Plaintiff's motion for reconsideration and motion for the Court to issue rulings,[1] and the parties' cross-motions for summary judgment.[2] (D.I. 54; D.I. 58; D.I. 61; D.I. 65). The matters have been briefed.

## I.     BACKGROUND

Plaintiff is an black female. (D.I. 23-3 at 10). She alleges Title VII employment discrimination by reason of race and sex, as well as retaliation. (*Id.* at 22). Her charge of discrimination states that she was promoted despite protests from those who became her immediate supervisors – one a Middle Eastern male and the other a black female. (*Id.*). The charge states that after her promotion, ongoing harassment increased, she was humiliated, called names, and forced to retake prior training. (*Id.*). The charge states that one of her supervisors specifically

---

[1]     The motion for court rulings will be denied as moot. (D.I. 61).

[2]     Plaintiff not only moves for summary judgment on the Title VII claims, but she also moves for summary judgment on the previously dismissed ADA and Rehab Act claims. The Court only addresses the Title VII claims.

told her that he believed the position to which she was promoted should have gone to a white individual because there were too many blacks in their unit. (*Id*.). In May 2015, Plaintiff began a medical leave of absence, and her supervisors asked for a medical update every two weeks. (*Id*.). Plaintiff complained and was told this was not required. (*Id*.). In her charge, Plaintiff contends discrimination occurred because of her race and sex, and she was retaliated against for her participation in protected activities.[3] (*Id*. at 14).

The record evidence indicates that on March 1, 2010, Plaintiff began her employment with DHSS as an Administrative Specialist II in its contracts management and procurement unit. (D.I. 23 at 9; D.I. 59 at 28, 37). The unit was led by manager of support services Wendy Brown ("Brown"), a black female, and purchasing services administrator Kieran Mohammed ("Mohammed"), a West Indian male. (D.I. 59 at 38, 41). Plaintiff worked directly for Brown and testified they had a positive working relationship. (*Id*. at 29).

In November 2013, Plaintiff applied for a promotion as a purchasing services coordinator II. (*Id.* at 37-38). Plaintiff was interviewed by a hiring panel comprised of Brown, Mohammed, and Annette Opalczynski, a white female. (*Id*. at 37-38, 41). In December 2013, Plaintiff was offered the promotion and she accepted. (*Id*. at 38, 41). According to Brown and Mohammed, Plaintiff's race and gender were not considered during the hiring process. (*Id*. at 38, 42).

In Plaintiff's answers to interrogatories she states that following her promotion Mohammed congratulated her, but he also informed her that he would have preferred to hire a white woman, white man, or middle-eastern woman for the position. (D.I. 45 at 3). The answers also state that Mohammed told Plaintiff that he did not want to be in the unit when the "shit hits the fan" for

---

[3] The Court does not address the disability discrimination claims raised in the charge of discrimination given their dismissal.

"too many Blacks in our unit." (*Id*.). Plaintiff testified that she reported Mohammed's statement to Brown who told Plaintiff that at an earlier time she and Mohammed had spoken about that but Brown did not expect Mohammed to "go back and tell you anything." (*Id*. at 29). Brown and Mohammed deny they made those comments. (*Id*. at 38, 42).

On January 29, 2015, Plaintiff met with the deputy director for the division of management services and told her that Brown was subjecting her to a progressively hostile and bullying work environment which included belittling Plaintiff in front of and within ear range of other employees, profanity, and name calling. (D.I. 23-4 at 10). The matter was forwarded to the DHSS labor relations unit and an investigation ensued. (*Id*.). The labor relations unit met with Plaintiff and asked her to provide a written account of her concerns. (*Id*. at 3). On February 11, 2015, Plaintiff submitted her memo and described "a few workplace environmental issues" she had been "progressively subjected to" from November 2013 through February 2015. (*Id*. at 3-9). Plaintiff was advised that only the more current issues could be addressed. (*Id*. at 10). Plaintiff relayed that in January 2015 Brown had yelled at her in front of other employees and at a unit meeting Brown waved her finger in the face of Plaintiff and called her a "dumb ass." (*Id*.). Brown admitted to the conduct, received verbal counseling, and was required to attend conflict resolution and working with difficult people classes. (*Id*. at 10-12).

On April 1, 2015, Plaintiff received her performance evaluation for the 2014 calendar year, with an overall performance rating of "meets expectations," the same rating as her peers. (D.I. 23-7 at 39-40; D.I. 59 at 38-39, 42). Brown and Mohammed both state that they did not take Plaintiff's race or gender into account when preparing her performance evaluation. (*Id*.). On April 3, 2015, Plaintiff submitted a rebuttal to the review. (*Id*. at 32-37). In her charge of discrimination, Plaintiff states that she was threatened with the possibility of never obtaining

another state job/position if she wrote a rebuttal to the performance review, and it was suggested that she may have mental stability issues that needed attention. (D.I. 23-3 at 14). Brown denies this. (D.I. 59 at 39).

On May 21, 2015, Plaintiff requested and received approval for a leave of absence for sciatica and stress. (D.I. 59 at 47-53). Paperwork completed by Plaintiff's physician certified that Plaintiff's chronic condition commenced in 1998. (*Id*. at 51). In her charge of discrimination, Plaintiff states that she was telephoned by Mohammed who stated that Brown had requested Plaintiff update her supervisors of her disability status every two weeks. (D.I. 23-3 at 14). Plaintiff complained to human resources and was told this was not a requirement. (*Id*.). While out on leave Plaintiff did not update Brown or Mohammed regarding her health issues or return to work date. (D.I. 59 at 39, 42).

The record includes a September 15, 2015 note from Plaintiff's physician that states Plaintiff is under the physician's care and her condition is permanent. (D.I. 23-8 at 5). On September 16, 2015, senior human resources technician Greg Gresham sent an email to senior human resources technician Kimberly Williams ("Williams") with an attached note from Plaintiff's physician and asked Williams to provide a copy to Plaintiff's supervisor and to provide paperwork to initiate a claim to transition from "STDI to LTDI." (D.I. 23-3 at 16) On October 26, 2015, Williams sent Plaintiff a letter advising her of the status of her short-term disability benefits.[4] (D.I. 59 at 44). The letter advised Plaintiff that she was to required to "accurately, completely, and timely" provide any and all documentation and information required by the short-term disability insurer (*i.e*., The Hartford) and her supervisor for the duration of her absence, and that it was "vitally important" that she and her physician consistently provide updated

---

[4]     A copy of the letter was sent to Plaintiff' supervisor.

medical information to The Hartford. (*Id*.) Plaintiff was warned that failure to cooperate and stay current could adversely impact her employment, leave, and pay. (*Id*.). Plaintiff was notified that if she was able, she must return to work full time before her short-term disability benefits were exhausted at the close of business on November 17, 2015. (*Id*. at 56). Plaintiff was notified that if she failed to or was unable to return to work full time prior to the exhaustion of the maximum short-term disability benefit period on November 17, 2015, and she had exhausted FMLA or was not eligible for FMLA, she would no longer be an employee of the State or any of its political subdivisions under Delaware law. (*Id*. at 57). On November 3, 2015, Plaintiff's psychologist authored a note and stated, "I think it is advisable that she not return to work at this time." (D.I. 23-8 at 7).

In early January 2016, DHSS human resources administrator Mary Parker ("Parker"), a black female, became aware that Plaintiff has not returned to work following exhaustion of her short-term disability benefits. (D.I. 59 at 62). After confirming that Plaintiff's short-term disability benefits had expired, Parker wrote to Plaintiff on February 9, 2016, and advised Plaintiff that DHSS had separated Plaintiff from employment as of November 18, 2015, because she had exhausted her short term disability benefits and failed to return to work. (*Id*. at 60, 63). Parker states that she did not consider Plaintiff's race or gender in her decision to terminate Plaintiff's employment. (*Id*. at 63). Both Brown and Mohammed state that they had no contact with Parker or anyone in human resources, were not consulted, and had no involvement in the termination of Plaintiff's employment. (*Id*. at 39, 42).

Parker states that she had no knowledge of Plaintiff's workplace concerns. (*Id*. at 63). Plaintiff testified that she had no evidence that Parker was biased against blacks or women. (*Id*. at 33). On January 11, 2016, Plaintiff made a complaint with the EEOC complaining of race,

gender, and disability discrimination, and retaliation.    (D.I. 23-3 at 9-10).    On January 25, 2016,

the EEOC mailed a charge of discrimination with Plaintiff's claims for her to sign and return.    (*Id.*

at 11-12)    The charge of discrimination, signed on February 5, 2016, was received by the EEOC

on February 8, 2015.    (*Id*. at 13-14).    Parker states that she did not become aware that Plaintiff

had filed an EEOC complaint until April 2016.    (D.I. 59 at 63).    On November 1, 2016, the U.S.

Department of Justice Civil Rights Division issued a notice of right to sue letter.    (D.I. 23-3 at

22).

## II.    <u>MOTION FOR RECONSIDERATION</u>

On December 18, 2018, the Court dismissed several claims in the Amended Complaint

upon Defendant's motion to dismiss, including all ADA claims and any purported claims under

§ 504 of the Rehab Act.    (D.I. 30; D.I. 31).    The Rehab Act claims were dismissed without

prejudice.    On April 26, 2019, Plaintiff filed a "motion to appeal dismissal of Doc #31 in part,

(2) Sec. 504 for the Rehabilitation Act," which the Court construes as a motion for reconsideration

of the order dismissing any purported claims under the Rehab Act.    (*See* D.I. 54).    Defendant

opposes the motion.

The standard for obtaining relief under Rule 59(e) is difficult for Plaintiff to meet.    The

purpose of a motion for reconsideration is to "correct manifest errors of law or fact or to present

newly discovered evidence."    *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d

669, 677 (3d Cir. 1999).    "A proper Rule 59(e) motion . . . must rely on one of three grounds:

(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need

to correct a clear error of law or fact or to prevent manifest injustice."    *Lazaridis v. Wehmer*,

591 F.3d 666, 669 (3d Cir. 2010) (citing *N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d

1194, 1218 (3d Cir. 1995)).    A motion for reconsideration is not properly grounded on a request

that a court rethink a decision already made. *See Glendon Energy Co. v. Borough of Glendon*, 836 F. Supp. 1109, 1122 (E.D. Pa. 1993). Motions for reargument or reconsideration may not be used "as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided." *Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1240 (D. Del. 1990). Reargument, however, may be appropriate where "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the court by the parties, or has made an error not of reasoning but of apprehension." *Brambles USA*, 735 F. Supp. at 1241 (D. Del. 1990) (citations omitted); *See also* D. Del. LR 7.1.5.

Plaintiff's motion for reconsideration discusses discovery received and recites the law under the Rehab Act. While not clear, Plaintiff seems to argue that the October 26, 2015 short term disability/return to work letter she received from Defendant through discovery on or about April 15, 2019 (*see* D.I. 50; D.I. 51) indicates that she qualifies as a person with a disability as is required to state a claim under the Rehab Act. Defendant opposes the motion on the grounds that it was not timely filed and Plaintiff failed to address the Court's reasons for dismissing the Rehab Act claims.

With respect to timeliness, Plaintiff filed her motion for reconsideration on April 26, 2019. Her motion is untimely under this Court's Local Rule 7.1.5 that requires a party to file a motion for reargument within 14 days after the Court issues its opinion or decision, with the exception of motions filed under Rule 59(3). The motion is also untimely because it was not filed within 28 days of entry of the December 18, 2018 Order as required under Fed. R. Civ. P. 59(e). *See Pellicano v. Office of Pers. Mgmt*., 714 F. App'x 162, 165 n.3 (3d Cir. 2017) (citing Fed. R. Civ. P. 59(e) (motions for reconsideration were untimely, because they were not filed within 28 days of the order entered)). Although Plaintiff seems to rely upon documents provided to her

through discovery in April 2019 which could explain her reason for not filing the motion for reconsideration sooner, the District Court does not have the authority to extend the time for filing the Rule 59(e) motions. *See Pellicano v. Office of Pers. Mgmt.*, 714 F. App'x at 165 n.3 (citing Fed. R. Civ. P. 6(b)(2) ("When an act may or must be done within a specified time, the court may, for good cause, extend the time," except that a "court must not extend the time to act under Rules 50(b) and (d), 52(b), 59(b), (d), and (e), and 60(b).")).

In addition, the Court dismissed the Rehab Act claim because the Amended Complaint did not include a claim for relief under the Act, and it did not allege a prima facie case of discrimination under the Act. (*See* D.I. 30 at 9). The Amended Complaint failed to allege that Plaintiff was qualified to perform the essential functions of her job at the time of her termination. Plaintiff seems to focus on her condition while she was receiving short-term disability benefits rather than whether the Amended Complaint alleged the elements of a prima facie case. Notably, the record evidence is that on November 3, 2015, Plaintiff's psychologist did not find it advisable for plaintiff to return to work.

Upon review, the Court finds that Plaintiff has failed to set forth any intervening changes in controlling law, new evidence, or clear errors of law or fact made by the Court to warrant granting reconsideration. *See Max's Seafood Café*, 176 F.3d at 677. Therefore, the motion will be denied. (D.I. 54).

III.   **CROSS MOTIONS FOR SUMMARY JUDGMENT**

   A.   **Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining whether a genuine issue of material fact exists, the

Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party, and a factual dispute is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-49 (1986).

The nonmoving party bears the burden to establish the existence of each element of his case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In doing so, the non-moving party must present specific evidence from which a reasonable fact finder could conclude in her favor. *Anderson*, 477 U.S. at 248; *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Summary judgment should be granted if no reasonable trier of fact could find for the non-moving party. *Radich v. Goode*, 886 F.2d 1391, 1395 (3d Cir. 1989). The same standards and burdens apply on cross-motions for summary judgment. *See Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

Plaintiff's opposition to Defendant's motion for summary judgment consists solely of argument and is not accompanied by a sworn affidavit or signed under penalty of perjury. Plaintiff did not cite to the record or provide any supporting evidence for consideration by the Court. Plaintiff, cannot simply assert factually unsupported allegations to meet her burden at the summary judgment stage. *See Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

Similarly, Plaintiff did not support her motion for summary judgment as she failed to cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the

motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact" as is required by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 56(c)(1)(A) & (B). "[T]he court is not obliged to scour the record to find evidence that will support a party's claims." *Perkins v. City of Elizabeth*, 412 F. App'x 554, 555 (3d Cir. 2011); *see also Holland v. New Jersey Dep't of Corr.*, 246 F.3d 267, 285 (3d Cir. 2001) (The court should not "be required to scour the . . . records and transcripts, without specific guidance, in order to construct specific findings of fact" to support its memorandum opinion and order.). As noted by the Seventh Circuit, "Judges are not like pigs, hunting for truffles buried in the record." *Doeblers' Pa., Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006) (citations omitted).

## B. Discussion

Title VII prohibits an employer from engaging in race or gender discrimination against an employee. *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318 (3d Cir. 2000). When there is no direct evidence of discrimination, the Court evaluates a plaintiff's Title VII claims according to the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Parson v. Vanguard Grp.*, 702 F. App'x 63, 67 (3d Cir. 2017).

### 1. Hostile Work Environment

Plaintiff moves for summary judgment on the grounds that the evidence of record supports a finding that Defendant violated federal laws. Defendant moves for summary judgment on the grounds that the hostile work environment claim is time-barred and, regardless, it did not subject Plaintiff to race and gender discrimination or a hostile work environment related to her race and gender.

To establish a Title VII hostile work environment claim, a plaintiff must

show that 1) the employee suffered intentional discrimination because of his/her [membership in a protected class such as sex or race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability.

*Larochelle v. Wilmac Corp.*, 769 F. App'x 57, 61 (3d Cir. 2019) (quoting *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (internal quotation marks an citations omitted). Not all workplace conduct that may be described as harassment rises to the level of a hostile work environment. *Clegg v. Falcon Plastics*, Inc., 174 F. App'x 18, 25 (3d Cir. 2006). Several factors inform that determination, such as the severity of the harassment, the frequency of the harassment, and the degree of abuse. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

"Workplace conduct is not measured in isolation; instead, whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001). Hence, simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Id.* at 271; *see also Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (noting that the standard for judging hostility under Title VII must be sufficiently demanding so that the statute does not become "a general civility code"). Rather, the plaintiff must show that she was subjected to continuous and repeated acts of harassment. *See Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 863 (3d Cir. 1990).

The record contains one incident that a jury could find was possibly motivated by race or gender. That is, when Mohammed told Plaintiff that he would have preferred to hire a white woman, white male, or Middle-Eastern for the position to which Plaintiff was promoted. However, the conduct complained of is neither pervasive nor severe enough to satisfy the requirements of a hostile work environment. The record reflects that despite Mohammed's preference, Plaintiff was offered the promotion. No other conduct implicates Plaintiff's race or gender.

In addition, the record reflects that Plaintiff did not complain of race or gender discrimination in January 2015 when she complained of a hostile and bullying work environment, when she provided a written account of her complaints a few days later, or in her rebuttal to her April 2015 performance review. Instead, Plaintiff relies upon her subjective beliefs to support her position that she was subjected to a hostile work environment. Plaintiff contends that Brown subjected her to a hostile work environment because Brown belittled and yelled at her, called her names (none of which were based upon race and gender), and that both Brown and Mohammed were critical of Plaintiff's work performance. Plaintiff testified, however, that "race and gender wasn't [sic] the biggest issues" for her. (D.I. 59 at 31). Plaintiff's subjective beliefs are insufficient to create a genuine issue of material fact. *See Fiorentini v. William Penn Sch. Dist.*, 665 F. App'x 229 (3d Cir. 2016). At most, the record reflects that Brown behaved inappropriately towards Plaintiff when she called her a name and yelled at her in front of other employees. Brown admitted to the conduct, received counseling, and was required to attend to different classes. Even if Brown's behavior was inappropriate, it was not indicative of race or gender discrimination. *See Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81 (1998) (Title VII is not a "general civility code."); *see also Barber v. CSX Distrib. Serv.*, 68 F.3d 694, 702

(3d Cir. 1995) (general complaint of unfair treatment does not translate into a charge of illegal discrimination).

After viewing the record, and considering the totality of the circumstances, the Court concludes that no reasonable jury could find that the claimed harassment was sufficiently severe or pervasive so as to create a hostile working environment. Therefore, summary judgment will be granted in favor of Defendant and against Plaintiff on the issue.[5]

### 3. Retaliation

Plaintiff moves for summary judgment on the grounds that the evidence of record supports a finding that Defendant violated federal laws. Defendant moves for summary judgment on the grounds that Plaintiff's termination from employment was not causally linked to any protected activity, and her employment was terminated for legitimate, nondiscriminatory reasons.

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) she engaged in conduct protected by Title VII; (2) after or contemporaneous with engaging in that conduct, her employer took an adverse action against her; (3) the adverse action was "materially adverse;" and (4) there was a causal connection between her participation in the protected activity and the adverse employment action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-69 (2006); *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006). A materially adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68. Whether an action is materially adverse "often depends on a constellation of surrounding

---

[5] The Court does not address whether the hostile work environment claim was timely filed with the EEOC, given that the record does not support a finding that Plaintiff was subjected to a hostile work environment based upon race and/or gender.

circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id*.

The Third Circuit allows a plaintiff to "rely on a 'broad array of evidence' to demonstrate a causal link between h[er] protected activity and the adverse action taken against h[er]." *Marra v. Philadelphia Hous. Auth*., 497 F.3d 286, 302 (3d Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co*., 206 F.3d 271, 284 (3d Cir. 2000)). "In certain narrow circumstances, an unusually suggestive proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection." *Id*. (internal quotations marks omitted). On the other hand, the "mere passage of time is not legally conclusive proof against retaliation." *Id.* (quoting *Robinson v. Southwestern Pa. Transp. Auth*., 982 F.2d 892, 894 (3d Cir. 1993)) (internal quotation marks omitted). A court may need to assess other factors as well – "[w]here the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, or other types of circumstantial evidence, such as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole." *Id*. (citation omitted). In any event, a plaintiff "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." *Daniels v. School Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015).

With respect to the causation prong, the Court considers whether a reasonable jury could link Defendant's conduct to retaliatory animus. *See Jensen v. Potter*, 435 F.3d 444, 449 n.2 (3d Cir. 2006) ("The ultimate question in any retaliation case is an intent to retaliate *vel non*.").

In this regard, the Court considers the "temporal proximity" between the plaintiff's protected activity and the employer's allegedly retaliatory response, and "the existence of a pattern of antagonism in the intervening period." *Id.* at 450.

In her charge of discrimination Plaintiff alleges retaliation occurred because she participated in protected activities. The record reflects that Plaintiff lodged a formal complaint against management in February 2015. She received her 2014 performance review in April 2015 of "meets expectations" and asserts she was told if she made a rebuttal to the review she faced the possibility of never obtaining another state job/position. In May 2015 Plaintiff sought and received medical leave. She lodged a complaint with the EEOC in January 2016, and on February 8, 2016, the EEOC received Plaintiff's charge of discrimination that she signed on February 5, 2016. Plaintiff was notified by letter dated February 9, 2016, that Defendant separated Plaintiff from employment as of November 18, 2015.

For purposes of the first element of a prima facie case, protected activity "includes not only an employee's filing of formal charges of discrimination against an employer but also informal protests of discriminatory employment practices, including making complaints to management." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d at 193. Here, the record reflects that Plaintiff engaged in protected activity when she made an informal complaint in February 2015 and a formal complaint in 2016. She has satisfied the first prong of a prima facie case of retaliation.

The Court turns next to the issue of a causal connection. With regard to the February 2015 complaint and Plaintiff's evaluation as well as the threat (which is in dispute) if she submitted a rebuttal to the evaluation, the time-frame, without more suffices to permit an inference of a causal connection. *See e.g.*, *Dolan v. Penn Millers Ins. Co*., 625 F. App'x 91, 94 (3d Cir. 2015) (proximity of three months is not "unusually suggestive," and is insufficient to establish a causal

connection). The record evidence is that neither Brown nor Mohammed considered Plaintiff's race or gender in her performance review. In addition, it is undisputed that Plaintiff's 2014 evaluation of "meets expectations" was identical as that received by her peers thus leading to the conclusion of no retaliation. As to the threat for submitting a rebuttal to the evaluation, threats alone, without a negative change in the terms and conditions of employment do not rise to the level of retaliation. *See Fago v. City Hartford*, 2006 WL 860126, at \*9 (D. Conn. Mar. 31, 2006). There is no evidence that Plaintiff sought and was denied another state job/position. Rather, the evidence of record is that approximately one month after Plaintiff received her evaluation, she sought and received medical disability. In light of the foregoing, no reasonable jury could find that retaliation occurred following Plaintiff's submittal of the 2015 internal complaint.

With regard to the January 2016 complaint to the EEOC, and the February 5, 2016 charge of discrimination and the termination of Plaintiff's employment on February 9, 2016, effective November 18, 2015, again the time-frame, without more suffices to permit an inference of a causal connection. The unrefuted evidence of record, however, is that Parker, who made the decision to terminate Plaintiff's employment had no knowledge of Plaintiff's workplace concerns and no knowledge that Plaintiff had filed an complaint with the EEOC until April 2016, after Plaintiff's employment had been terminated. Nor is there record evidence that Brown and Mohammed had contact with Parker or anyone in Human Resources, that they were consulted about the termination of Plaintiff's employment, or that they had involvement in the termination of Plaintiff's employment.

Finally, Defendant has proffered a "legitimate non-discriminatory" reason for terminating Plaintiff's employment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). The record reflects that Plaintiff's employment was terminated when she did not return

16

to return to work following the end of her short term disability period. Nothing before the Court contradicts Defendant's proffered reasons for the actions it took. Nor are its proffered reasons for its actions weak, incoherent, implausible, or so inconsistent that a reasonable factfinder could rationally find them unworthy of credence. *See Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

The Court finds that the evidence of record fails to create a triable issue about the existence of causation. Plaintiff cannot make a prima facie showing of retaliation as a matter of law and, therefore, the Court will grant summary judgment in favor of Defendant and against Plaintiff on the retaliation claims.

## IV.     CONCLUSION

For the above reasons, the Court will: (1) deny Plaintiff's motion for reconsideration (D.I. 54); (2) grant Defendant's motion for summary judgment (D.I. 58); (3) deny as moot Plaintiff's motion for court rulings (D.I. 61); and (4) deny Plaintiff's cross-motion for summary judgment (D.I. 65).

An appropriate order will be entered.